# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Sean Essington, Administrator of the : <br>
Estate of David Essington, deceased, : <br>
               Appellant :   No.  1081 C.D. 2022 <br>
              : <br>
          v. :   Argued: June 6, 2023 <br>
              : <br>
Monroe County Transit Authority, : <br>
A Pocono Country Place Property : <br>
Owners Association, Inc. a/k/a : <br>
A Pocono Country Place Property : <br>
Owners Association and : <br>
Commonwealth of Pennsylvania, : <br>
Department of Transportation : <br>
              : <br>
          v. : <br>
              : <br>
Joaquin Acevedo-Soltren : <br>

BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge <br>
                HONORABLE LORI A. DUMAS, Judge <br>
                HONORABLE STACY WALLACE, Judge <br>

## *OPINION NOT REPORTED*

MEMORANDUM OPINION <br>
BY JUDGE McCULLOUGH                         FILED: July 11, 2023

        Sean Essington, Administrator of the Estate of David Essington, deceased, (Appellant), appeals from three orders entered by the Court of Common Pleas of Monroe County (trial court) on August 15, 2022, granting summary judgment in favor of Monroe County Transit Authority (Authority), Commonwealth of Pennsylvania, Department of Transportation (PennDOT), and A Pocono Country Place Property Owners Association, Inc. (Property Owners Association or

Association), and dismissing Appellant's complaint. Appellant also appeals from a fourth order entered by the trial court on December 16, 2020, sustaining the preliminary objections of the Authority as to the assertion of liability under the real estate exception to what is commonly known as the Political Subdivision Tort Claims Act[1] (Tort Claims Act), 42 Pa. C.S. § 8542(b)(3), and dismissing Count II (violation of the Pennsylvania Constitution) of Appellant's complaint.[2] Upon careful review, we affirm in part, and reverse in part.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

On October 30, 2017, at approximately 8:30 p.m., 17-year-old David Essington (the decedent) was struck by an oncoming car while crossing State Road 196 (SR-196) near its intersection with Woodside Drive, in Coolbaugh Township, Monroe County. (Reproduced Record (R.R.) 490a, 508a-09a.) The decedent suffered multiple traumatic injuries and died a few hours after the accident. *Id*. at 1078a.

SR-196 is a two-lane highway running north and south, with a dividing double-yellow line, and a posted speed limit of 45 miles per hour (m.p.h.). *Id*. at 440a-91a. Each lane is about 10 feet wide, with a shoulder on each side of about 2.5 feet, which is marked off by white lines. *Id*. at 491a, 545a. In this "very rural area" there are no sidewalks, no street lighting, and no pedestrian crosswalk. *Id*. at 440a, 491a, 547a, 1676a. To the east of the accident site are woods. *Id*. at 440a.

---

[1] The parties agree that the Authority is a local agency for immunity purposes. *See also Flaxman v. Burnett*, 574 A.2d 1061, 1065 (Pa. Super. 1990) (concluding that the Authority is a local agency). The parties also agree that as a local agency, the Authority is immune from liability for personal injury and property damage claims unless the claim falls within one of the exceptions to immunity specified in 42 Pa. C.S. § 8542.

[2] The orders appealed from are final and appealable orders.

A Pocono Country Place (the Development) is a large, gated, residential development consisting of over 4,000 single-family homes. *Id*. at 545a, 660a. The Development is a private community intended for residents and their guests only. The Development has two gated entrances, known as the Main Gate and the K-L Gate. There are also emergency-access only gates located at Brentwood Drive, Woodside Drive and Millwood Overlook Drive where they intersect with SR-196. Although no vehicular traffic can access the Development at the emergency gates, pedestrians can access the Development through the emergency gates. The accident that occurred in this case occurred on SR-196 at the intersection of Woodside Drive.

Just prior to the accident, the decedent had been riding a bus operated by the Authority. *Id*. at 510a. The Authority had established a bus stop on the northbound side of SR-196 at its intersection with Woodside Drive many years before the accident (Woodside Drive Bus Stop). Riders getting off the bus at the Woodside Drive Bus Stop would be required to cross SR-196 if they wanted to enter at the gated Woodside Drive entrance. No improvements were made at the Woodside Drive Bus Stop, other than a sign noting an Authority bus stop at the location.

The Authority had five bus stops to service residents of the Development. Pursuant to a 2010 license agreement between the Association and the Authority, the Association permitted the Authority to construct three of the five bus stops, with shelters, on the Association's property. The Woodside Drive Bus Stop, which was located on SR-196, did not have a shelter.

Riders did not have to get off at the Woodside Drive Bus Stop and cross SR-196 to access the Development at Woodside Drive. They could wait until the bus turned around at the K-L Gate, and disembark on the same side of the

3

Development.  Authority buses are required to let riders off at whatever location they choose.

On the night of the accident, the decedent got off the bus at the Woodside Drive Bus Stop.  *Id*. at 508a, 877a.  Another bus passenger, Taimar Mosley, exited the bus in front of the decedent.  *Id*. at 508a.  They both proceeded toward the rear of the bus, as required by the Authority.  *Id*. at 926a, 1066a.  The bus merged back onto SR-196, and Mosley stepped into the street, with the decedent following behind him.  *Id*. at 508a, 1066a.

Meanwhile, Joaquin Acevedo-Soltren (hereinafter the Driver) had left his home at A Pocono Country Place and was heading toward Wal-Mart in his 2004 Hyundai Elantra.  *Id*. at 499a, 1129a, 1180a.  The Driver was proceeding south along SR-196 with his car's high-beam headlights illuminated.  *Id*. at 509a, 1137a-39a.  The Driver came out of a curve into a straightway of about 100 yards.  *Id*. at 528a-31a, 543a, 1156a.  The Driver saw the bus, about 150 yards ahead on SR-196, and switched to his low-beam headlights so as not to blind the bus driver.  *Id*. at 1137a-38a, 1141a-42a.

According to the Driver, the bus driver, Everette Grant, had his high-beam headlights on but did not switch to his low-beam headlights, a fact which the bus driver disputes.  *Id*. at 932a, 1134a.  The glare from the bus's bright headlights temporarily blinded the Driver, causing him to glance down at the car's speedometer for a "split second."  *Id*. at 1134a, 1144a.  The Driver was going about 45 m.p.h. but had his foot on the brake.  *Id*. at 1145a-51a.  Once the Driver recovered his sight, he quickly glanced over at the bus driver.  *Id*. at 1147a.  About a second or two later, the Driver turned his attention back to the road.  There, only 30 to 50 feet in front of him, was the decedent.  *Id*. at 1134a, 1147a, 1166a, 1183a.

4

By this point, Mosley had already crossed SR-196. *Id*. at 1066a. Moments earlier, Mosley had started crossing the street. He looked both ways and did not see any oncoming cars. *Id*. at 1066a-67a. Once the bus was farther up the road and Mosley was halfway across the street, he looked right again and saw "a car really close." *Id*. at 1066a-67a. He rushed across the street and turned back to see if the decedent had made it. *Id*. at 1066a-67a. The Driver did not see Mosley crossing the street. *Id*. at 1164a.

The decedent was dressed entirely in black—hat, shirt, and shorts. *Id*. at 1168a. He had a headphone in one ear (a fact confirmed on the Authority's video) and a phone in his hand. *Id*. at 509a, 522a, 1134a, 1168a, 1186a. The decedent appeared to be looking down at the phone. *Id*. at 1185-86a. The Driver slammed on the brakes and turned to the left, but he could not avoid hitting the decedent. *Id*. at 1134a.

*The Complaint*

Appellant instituted this suit by filing a complaint in the United States District Court for the Middle District of Pennsylvania against the Authority, PennDOT and the Association. *Id*. at 27a-67a. The Authority joined the Driver as an additional defendant. *Id*. The remaining defendants filed cross-claims against each other. On September 24, 2020, the matter was transferred to the trial court pursuant to 42 Pa. C.S. § 5103.[3]

In **Count II**, (Violation of Pennsylvania Constitution), it is alleged that the **Authority** permitted the decedent to disembark at the Woodside Drive Bus Stop knowing that it was unsafe and that its conduct resulted in a state-created danger to

---

[3] The U.S. District Court dismissed Count I brought pursuant to 42 U.S.C § 1983, against the Authority, which alleged federal civil rights violations (State-created danger). The remaining state law claims were dismissed without prejudice.

5

the decedent in violation of the substantive due process rights to bodily integrity secured by article 1, § I of the Pennsylvania Constitution, PA. CONST. *Id*. at 47a-49a.

In **Count III** (Negligent Operation of a Motor Vehicle), Appellant asserts that the **Authority** negligently operated the bus in such a manner so as to require the decedent to disembark the bus onto the narrow, unprotected shoulder of northbound SR-196 at a point without sufficient sightlines, sight distances and/or unobstructed views of oncoming traffic, and without signs, guardrails, bus shelters, pull-offs, roadway cutouts, or any other feature or mechanism that would provide safety or protection for the decedent. *Id*. at 51a-53a. Appellant further alleges that the Authority operated the bus in such a manner that required the decedent to disembark the bus at an unreasonably dangerous location, blocked the view of the decedent from observing oncoming traffic while crossing SR-196, and prevented vehicles proceeding southbound on SR-196 from observing the decedent crossing the roadway. *Id.* Appellant also alleges that the Authority (1) operated the bus in such a manner that its headlights obstructed the view of oncoming vehicles; and (2) failed to warn the decedent of oncoming vehicles or warn oncoming vehicles that the decedent had just disembarked. *Id*.

In **Count IV** (Negligent Maintenance of Real Property), Appellant asserts that **PennDOT** and the **Authority** are liable under the real property exception to the grant of immunity under the Sovereign Immunity Act[4] and the Tort Claims Act. The complaint alleges that **PennDOT** and the **Authority** acted negligently in allowing a dangerous condition to occur on SR-196 and by failing to erect signs, lights, guiderails, bus shelters, crosswalks, traffic control devices, warning signals,

---

[4] 42 Pa. C.S. § 8522.

or other features to protect disembarking bus passengers. Appellant alleges that the failure to provide any type of safety protection exposed disembarking passengers to an unreasonable risk of being struck from oncoming vehicles. The complaint further alleges that **PennDOT** and the **Authority** failed to inspect, discover and correct the dangerous condition. *Id*. at 54a-56a.

In **Count V** (Negligence), Appellant avers that the **Property Owners Association** knew that pedestrian use of the Woodside Drive entrance to the Development was unreasonably dangerous. Appellant further argues that, although the Property Owners Association facilitated and encouraged its residents to ride Authority buses, it unreasonably denied the Authority's request to operate its buses inside the gated community. Appellant contends that this route would have eliminated the need for members of the Association to disembark on SR-196. Appellant contends that the Association breached the duty of care it owed to the decedent by subjecting him to the risk of being struck by oncoming vehicles and this resulted in harm to the decedent. *Id*. at 58a-62a.

**Count VI** alleges a cause of action under the Pennsylvania Wrongful Death Act, 42 Pa. C.S. § 8301, against all defendants. *Id*. at 62a-65a.

**Count VII** alleges a survival action under the Survival Act, 42 Pa. C.S. § 8302, against all defendants. *Id*. at 65a-66a.

*The Authority's Preliminary Objections*

On October 14, 2020, the Authority filed preliminary objections to the complaint, arguing that **Count II**, alleging a cause of action under the Pennsylvania Constitution, should be dismissed because other remedies exist, such as negligence, that could support recovery. The Authority also argued that the complaint failed to

7

plead causes of action against the Authority under the motor vehicle and real property exceptions to liability under the Tort Claims Act. *Id*. at 68a-73a.

In an order dated December 16, 2020, the trial court sustained the Authority's preliminary objection as to Count II. It also sustained the Authority's preliminary objection to Appellant's assertion of liability under the real estate exception to the Tort Claims Act but overruled its objection to the assertion of liability under the motor vehicle exception. In sustaining the Authority's preliminary objection as to the real property exception to liability, the trial court reasoned that the Authority neither owned, maintained nor controlled the real estate where the bus stopped, and that the Authority had no duty, as alleged by Appellant, to build a shelter at the location of the bus stop. *Id*. at 206a-18a.

## II.    DEPOSITIONS AND EXPERT REPORTS

In the crash reconstruction report from the Pocono Mountain Regional Police Department, Trooper Daniel Jones attributed the accident to several factors: the glare from the bus's headlights temporarily blinded the Driver; the 32-foot bus both obscured the Driver from the decedent and the decedent from the Driver; the lack of artificial lighting, combined with the dark clothing the decedent was wearing; and the decedent's use of an ear bud along with the sound of the bus engine may have masked the sound of the Driver's approaching car. *Id*. at 483a-531a. Trooper Jones concluded that these factors combined "to make [the decedent] a low contrast silhouette" and that consequently, the Driver "could not have perceived, reacted to and avoided" the collision. *Id*. Trooper Jones also found that both the Driver and the decedent had violated Pennsylvania law. The Driver's brakes were deficient, *id*. at 504a, 519a, and the decedent failed to yield the right-of-way to the Driver. *Id*. at 519a, citing 75 Pa. C.S. §§ 3543, 3544.

8

Authority Assistant Executive Director Richard Schlameuss testified at his deposition that the Woodside Drive Bus Stop had been there for as long as he was employed by the Authority—at least 13 years. *Id*. at 870a, 874a. Schlameuss recounted that prior to 1991, little consideration was given where to locate a bus stop. *Id*. at 871a-72a. When the Authority places a bus stop on a state road in PennDOT's right-of-way, PennDOT is not notified. *Id*. at 872a. Prior to the accident, the Authority had no safety concerns about the Woodside Drive Bus Stop. *Id*. at 879a. After the accident, the Authority removed this bus stop. *Id*. at 879a. That decision was based on the "slight curve" in the road, and "shallow shoulder," which is near "[i]naccessible vegetation." *Id*. Those conditions made this "not quite the ideal bus stop." *Id*.

The Authority produced an expert report by Frank Costanzo, an accident reconstructionist. *Id*. at 541a-58a. Costanzo concluded that the "actions and inactions" of the decedent and the Driver contributed to the occurrence of the accident. *Id*. at 541a-58a. He opined that the decedent "had the ability to clearly see" the Driver's oncoming car and yet "carelessly entered" the southbound lane of SR-196. *Id*. at 541a-58a. Costanzo also noted that the Driver had not maintained the brakes of his vehicle, in violation of three Pennsylvania statutes, but he also said that the Driver had insufficient time to complete his perception/reaction phase and avoid the collision. *Id*. at 558a.

Appellant presented the expert testimony of Timothy Reilly, a professional engineer. Mr. Reilly noted that, based on the deposition testimony of Schlameuss, the Authority did not use a "bus stop checklist" (guidelines) to evaluate this area as a safe place for a bus stop. *Id*. at 537a. Further, Mr. Reilly stated the Authority did not consult with PennDOT to aid in its evaluation of this area as a bus

stop. *Id.*

Mr. Reilly concluded that the accident was caused by the designation of Woodside Drive Bus Stop without "pedestrian accommodations," such as a crosswalk and "adequate lighting." *Id.* at 538a-39a. If it was necessary for the Authority to designate this area as a bus stop, it should have advocated to PennDOT or Coolbaugh Township for these safety features. *Id.* at 538a. If these safety features could not be placed in this area, then the Authority should not have permitted passengers to exit here. *Id.* Instead, the Authority should have restricted the bus stop to the southbound side of SR-196 (the other side of the street). *Id.* Thus, Mr. Reilly concluded, the Authority's decision to allow the decedent to exit at the Woodside Drive Bus Stop was a "significant contributing factor" of the accident. *Id.* Mr. Reilly agreed with a conclusion of Trooper Jones in his crash reconstruction report that the bus was a "large visual impediment" obstructing the decedent's view of the Driver's car, and the Driver's view of the decedent. *Id.* Mr. Reilly concluded, however, that there were no geometric sight distances from the built environment impacting the ability of either of the involved parties to view one another. *Id.* at 441a.

PennDOT's District Traffic Engineer, Derrick Herrman, testified that, pursuant to the Pennsylvania Code, the placement of bus stops does not require PennDOT's approval. *Id.* at 480a. With one limited exception not applicable here, the Authority can put a bus stop wherever it desires. *Id.* at 480a-81a.

The Property Owners Association presented evidence that in 2016, the Authority, desirous of increasing ridership on its buses, proposed a fixed route within the development which would have allowed the buses to enter the gated community to pick up and drop off riders. Following an open board meeting, during which

10

residents in attendance were overwhelmingly opposed to the proposal, the board of directors of the Association voted against allowing Authority buses into the gated community. (R.R. 646a, 672a-673a.)

## III. TRIAL COURT OPINIONS

Upon completion of discovery, the Authority, PennDOT and the Property Owners Association each moved for summary judgment. On August 15, 2022, by separate opinions and orders, the trial court granted each of the motions and dismissed Appellant's complaint in its entirety.

### *The Authority*

The Authority moved for summary judgment on the remaining cause of action against the Authority in Count III, which asserts that the Authority breached its duty of care by allowing the decedent to disembark at a bus stop that was inherently dangerous. (R.R. 300a-21a.)

To begin, the trial court agreed with Appellant that allowing the decedent to disembark at the Woodside Drive Bus Stop was part of the operation of the bus as contemplated by the Tort Claims Act, 42 Pa. C.S. § 8542(b)(1). The trial court went on to conclude, however, that the Authority's conduct was not the proximate cause of the decedent's harm. (Trial Court Authority Opinion (Authority op.) at 6.)

The trial court reasoned that although the Authority chose to put a stop at Woodside Drive, it was not responsible for the narrow shoulder, lack of guardrails, sidewalks, lights, bus shelters, or cutaways in the state roadway. The road was owned by PennDOT, which chose not to make these improvements to the rural road. The trial court further held that, in any event, there was no evidence adduced during discovery that any of these conditions, which were related to the conditions of the

11

bus stop itself, caused the harm to the decedent. *Id*. Wider shoulders, guardrails, sidewalks, lighting, a bus shelter or road cutaway would not have protected the decedent from the accident, which occurred in the middle of the southbound lane. The trial court also rejected Appellant's claim that the decedent had no choice but to cross SR-196 when he did in order to protect himself from oncoming vehicles traveling northbound because there was no evidence produced that there were any oncoming vehicles approaching the decedent along the northbound lane that he had to avoid. The accident, the trial court concluded, occurred because the decedent was wearing dark clothing, was distracted and crossed the lane of traffic in front of an oncoming car. *Id*. The trial court noted that no evidence was presented that a streetlight at the location would have prevented the accident and that Appellant's claim in this regard was merely a presumption which is inadequate for the necessary proof of proximate cause. Further, there was no evidence presented that established that better lighting at the intersection would have prevented the accident because the Driver of the other vehicle said he was momentarily blinded by the bus's headlights. The trial court agreed with the Authority that the bus stop was generally safe because the Authority had no prior notice of any other accidents at the stop, or that the stop was dangerous in any way.

The trial court concluded that the Authority was not negligent by letting the decedent off at a bus stop with the physical conditions that existed. *Id*. at 7. The trial court also concluded that there was no evidence to support that the bus operator negligently operated the bus itself or its headlights. It rejected Appellant's claim that the Authority was negligent by stopping at this location due to the bus itself being such a large visual impediment, reasoning that this condition is not any different than any other start or stop of a bus, and because there was no evidence that

12

the stop itself made the bus a more dangerous impediment than usual. Finally, the trial court noted that the decedent did not have to get off at this stop. He could have stayed on the bus until it turned around a few miles later and disembarked on the same side of the road as the Development. *Id*. at 9.

### *PennDOT*

PennDOT moved for summary judgment based on sovereign immunity.[5] (R.R. 454a-69a.) PennDOT argued that the accident was not caused by any dangerous artificial condition arising out of SR-196 itself. *Id*. at 460a-67a. It maintained that Appellant's claims, which are based on the absence of lighting and other pedestrian accommodations, fall outside the real estate exception to sovereign immunity. PennDOT further argued that it had no duty to install lighting or traffic control devices at the Woodside Drive Bus Stop, and that it had no involvement in designating the location of the bus stop. PennDOT also emphasized that sovereign immunity barred Appellant's claim for wrongful death damages. *See* 42 Pa. C.S. § 8301. *Id*. at 468a-69a.

The trial court granted PennDOT's motion for summary judgment. (PennDOT Opinion (PennDOT op.) at 8.) The trial court noted that the evidence showed that PennDOT had no role in designating the Woodside Drive Bus Stop. *Id*. at 5. Further, Appellant's allegations that PennDOT failed to install certain safety features on SR-196 was "not a defect on the land itself," nor was it a condition created by PennDOT. *Id*. at 5. The trial court noted that the real estate exception applies to a condition of the Commonwealth real estate itself, and not to negligent policies or activities (such as failure to inspect) regarding the real estate.

---

[5] 42 Pa. C.S. §§ 8521-8528.

13

Considering the foregoing, the trial court concluded that PennDOT was entitled to sovereign immunity. *Id*. at 3-7.

The trial court also addressed the issue of damages for wrongful death. *Id*. at 8. The trial court concluded that sovereign immunity barred Appellant, who is the decedent's parent, from pursuing damages for non-pecuniary loss, future services, financial support, and medical bills. *Id*.

### *The Property Owners Association*

The Property Owners Association also moved for summary judgment on Appellant's claim that it was negligent in facilitating residents' use of a bus stop outside of the community and failing to ensure that it was safe, and that it was negligent in failing to allow the Authority inside the gated community to pick up and drop off residents.

The trial court granted the Property Owners Association's motion for summary judgment. The trial court found no evidence that the Property Owners Association encouraged the use of the Authority as transportation, and that even if it did, that was insufficient to find it legally responsible for the decedent's harm. (Trial Court Association Opinion (Association op.) at 6.) The trial court further found that the Association had no control over the number and locations of the bus stops into its Development and consequently no duty to the decedent to ensure a safer bus stop. The trial court rejected Appellant's assertion that the Association breached its duty to decedent by denying the Authority access to have a dedicated bus route inside the Development. The trial court found that the Association's decision not to allow a route that would have brought non-residents into the community was reasonable, and in any event not a proximate cause of the accident. *Id*. at 8-9.

14

Appellant now appeals.[6]

## IV. ANALYSIS

## A. The Authority

Appellant argues that the trial court erred in granting summary judgment in favor of the Authority because questions of material fact exist as to whether the negligent operation of the bus by the Authority was a proximate cause of decedent's death, specifically whether the Authority breached its duty by: (1) discharging the decedent onto the unprotected side of SR-196, at night, at a location that required him to cross both the northbound and southbound lanes of travel and which provided no cover, shelter or other means of protecting himself; and (2) improper use of its highlights. Appellant also asserts that the trial court erred in sustaining the preliminary objections[7] of the Authority and dismissing Count II of the complaint which alleged negligence under the real estate exception of the Tort Claims Act.

---

[6] The standard in reviewing the grant of summary judgment is *de novo* and the scope of review is plenary. *Chanceford Aviation Properties, LLP. v. Chanceford Township Board of Supervisors*, 923 A.2d 1099, 1103 (Pa. 2007). The court "must view the record in the light most favorable to the non-moving [party], and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Id.* Summary judgment is to be entered only in the clearest of cases where there is not the slightest doubt as to the absence of a triable issue of fact. *Trowbridge v. Scranton Artificial Limb Co.*, 747 A.2d 862, 864 (Pa. 2000).

[7] In reviewing a trial court's grant of preliminary objections, this Court's standard of review is *de novo* and its scope of review is plenary. *Mazur v. Trinity Area School District*, 961 A.2d 96 (Pa. 2008). This Court must accept as true all well-pleaded material facts in the complaint and all inferences reasonably deducible therefrom. *Connor v. Archdiocese of Philadelphia*, 975 A.2d 1084 (Pa. 2009). The Court may sustain preliminary objections only when, based on the facts pleaded, it is clear and free from doubt that the complainant will be unable to prove facts legally sufficient to establish a right to relief. *Mazur*, 961 A.2d at 101.

*Obviously Perilous Point*

Appellant contends that the Authority's act of allowing the decedent to disembark at an obviously perilous point subjects it to liability under the vehicle liability exception of the Tort Claims Act.

The law imposes upon a common carrier the duty to allow passengers to alight from a vehicle in a safe manner. It must give passengers a safe place to alight and to pass out of danger. *Homa v. Wilkes-Barre Transit Corporation*, 147 A.2d 377, 378 (Pa. 1959) (quoting *Stevens v. Reading Street Railroad Co.*, 121 A.2d 128, 132 (Pa. 1956)). A bus company has a duty to not only carry its passengers safely, but to afford them an opportunity to safely alight. *Tyler v. Insurance Co. of North America*, 457 A.2d 95, 98 (Pa. Super. 1983). *See also Stewart v. Loughman*, 80 A.2d 715, 717 (Pa. 1951) ("It is the duty of a common carrier of passengers to exercise the highest practical degree of care and to afford them a safe means of ingress and egress to and from the car or other vehicle of transportation.").

The carrier cannot discharge passengers at an "obviously perilous point." *Curry v. Napolitano*, 8 Pa. D. & C. 2d 544, 548 (1956), *aff'd*, 133 A.2d 555 (Pa. 1957) (citing *O'Malley v. Laurel Line Bus Co.*, 166 A. 868 (Pa. 1933); *Brown v. Ambridge Yellow Cab Co.*, 97 A.2d 377 (Pa. 1953)). After a passenger alights, the common carrier's duty ends, and it is generally not liable for any injuries sustained as a result of being struck by another motor vehicle while walking across the street. *Harris v. De Felice*, 109 A.2d 174 (Pa. 1954); *Knoud v. Galante*, 696 A.2d 854 (Pa. Super. 1997).

In *Reid v. Scranton Transit Co.*, 12 A.2d 553 (Pa. 1940), a passing car struck the plaintiff's foot and leg while he was leaving the defendant's streetcar in mid-afternoon. The plaintiff argued that the streetcar company was negligent by

16

discharging him in the middle of a street, at a place that was not safe because of traffic, and without warning him of the danger. The trial court entered a compulsory nonsuit and held that the streetcar company was not negligent. The Supreme Court affirmed, holding that the evidence showed that traffic passed on both sides of the streetcar, whose driver could not be expected to anticipate that the driver of a vehicle would disregard the law against passing streetcars.

In *Troy v. Scranton Transit Co.*, 81 A.2d 547 (Pa. 1951), the plaintiff stepped off a bus approximately 100 to 150 feet beyond the usual stop. As the bus moved away, plaintiff ran across the road and was struck by a motorist after crossing the road's centerline. She charged the bus company with negligence for permitting her to get off the bus at a place other than the usual bus stop. The Supreme Court affirmed the grant of a compulsory nonsuit, holding that no evidence showed that the location at which the plaintiff disembarked from the bus was dangerous.

In *Harris*, the plaintiff asked the operator of a streetcar to let him off opposite an inn, which was not a regular stop, at approximately two o'clock a.m. The driver obliged, and the departing passenger waited until the vehicle moved off before proceeding into the roadway. The plaintiff walked to the middle of the road, looked for traffic, then proceeded across the remainder of the road. Before reaching his destination, he was struck by a car. The Supreme Court held that the streetcar company did not discharge the plaintiff at a "manifestly dangerous place," and, therefore, it was not liable for his injuries. 109 A.2d at 177.

In *Lehman v. Lebanon Coach Co*., 38 Pa. D. & C. 4th 470, 487-88 (1998), *aff'd*, 788 A.2d 1038 (Pa. Super 2001) (Table), a minor disembarked from a public transit bus and was struck by a car while crossing a street to get to her school. The court held that the location at which the bus company discharged the plaintiff

17

was not an "obviously perilous point" or a "manifestly dangerous place." *Id*. at 487-88. "To the contrary, this discharge site had apparently been a regular stop on this particular public transit bus run. [The p]laintiff and her friends in fact exited the bus without incident and were safely proceeding on the sidewalk for some distance prior to the accident *en route* to their final destination." *Id*. at 488. The court concluded that the law does not impose upon the common carrier the duty to ensure that its passenger arrive at his or her destination safely, and it only imposes a duty to refrain from allowing a passenger to disembark at a manifestly dangerous place. *Id*.

Here, Appellant failed to adduce any evidence that would have established that the Woodside Drive Bus Stop was an "obviously perilous point" or a "manifestly dangerous place." In an attempt to meet this burden, Appellant argues that there was no adequate street lighting illuminating the roadway/intersection where the accident took place. Appellant also argues that the shoulder areas of SR-196 at that location are narrow, and relies on the testimony of the Authority's corporate designee, Mr. Schlameuss, who testified that "there's a slight curve, there's a shallow shoulder, you know and not far from the shoulder is inaccessible vegetation" so "it's not quite the ideal bus stop." (R.R. at 879a.) Appellant argues that notwithstanding the dangerous condition of the roadway at this location, the Authority made the decision to utilize this location as a bus stop. Appellant further relies on the testimony of Trooper Jones, who determined that "[t]he existing roadway design does not provide a safe area for pedestrians to walk along the northbound lane of travel and provides a minimal area beyond the edge line (fog line) for pedestrians." (R.R. 851a.) Appellant argues that the narrow shoulder forced the decedent to quickly cross SR-196 so as not to be struck by northbound traffic.

18

Having reviewed the record, and considering the evidence in a light most favorable to Appellant, we are unable to conclude that the trial court erred in granting summary judgment in favor of the Authority. First, we agree with the trial court that Appellant failed to establish that the Woodside Drive Bus Stop was necessarily a perilous or dangerous place to discharge passengers. Appellant's focus on the lack of wider shoulders, guardrails, sidewalks, lighting, a bus shelter, or road cutaway misses the mark because these features would not have protected the decedent from the accident. The accident did not occur at or near the bus stop, or along the side of the northbound lane. It occurred after the decedent left the area of the bus stop and was in the middle of the southbound lane. He had already left the bus stop, the northbound lane, and was in the process of crossing the southbound lane when he was struck. There was no evidence that the decedent was unable to stand on the shoulder and wait at the Woodside Drive Bus Stop until the road was clear before he attempted to cross SR-196. Moreover, the location where the decedent crossed SR-196 is perfectly straight. The fact that there was a slight curve approximately two-tenths of a mile north of the bus stop did not render it dangerous, especially in light of Appellant's expert, who testified that there were no geometric sight distances from the built environment impacting the ability of either of the involved parties to view one another. (R.R. 441a.) To the extent Appellant argues that the narrow shoulder "forced" the decedent to cross SR-196 at the moment he did and into the path of the Driver, there was no evidence that he moved from the shoulder so as not to be struck by northbound traffic or that there were any cars following the bus in the northbound lanes at a close enough distance to put the decedent in peril. In *Harris*, the Supreme Court rejected a similar argument. There, after the plaintiff got off the bus, he attempted to cross two lanes of traffic. *Harris*,

109 A.2d at 176. When he was about three-quarters of the way across the road, he was struck by an automobile. Like Appellant here, the plaintiff contended that the place of discharge was obviously perilous because there was no place to stand in safety on the southerly side of the street. He testified that "[i]f [he] stayed where [he] was, a car might have come down the other way and hit [him], because there was nothing there but a little curb." *Id.* The Supreme Court rejected this argument as mere conjecture as the "only conceivable way that the plaintiff would be endangered if he remained where he was standing would be the wholly fortuitous circumstance of an automobile leaving the highway at that point." *Id*. at 177.

Moreover, the trial court did not err in concluding that the Woodside Drive Bus Stop was not unsafe based on the lack of any prior accidents. In *Reid*, 12 A.2d at 553-54, the Supreme Court held that the fact that defendant had discharged its passengers at the same point for approximately four years without incident was an element in favor of the proposition that the location was not obviously perilous.

Appellant also argues that the Authority's bus itself created a visual obstruction not only to the passengers who were just discharged and attempting to cross to safety, but also to any oncoming vehicle traveling in a southbound direction. Appellant's expert, Mr. Reilly, testified that "the presence of the subject [Authority] bus would have acted as a large visual impediment blocking the oncoming driver's "ability to see [the decedent.]" (R.R. 1266a.) Clearly, the fact that the bus might obstruct the view of a departing passenger or an oncoming car does not itself render the bus stop manifestly dangerous. If it did, then all bus stops would be perilous because all buses are large vehicles that obstruct someone's field of vision.

20

*Improper Use of High Beams*

Next, Appellant contends that the trial court erred by entering summary judgment on his claim that the driver of the Authority's bus was negligent by improperly utilizing the bus's high beams. Appellant points to disputed evidence that the Driver of the car that struck the decedent was temporarily blinded by the bus's high beams and this was the cause of the collision.

There remains a question of fact as to whether the bus driver was negligent by improperly utilizing his high beams. During discovery in this matter, the Authority's witness testified that the bus driver "did nothing wrong" and that "from watching the video" he "did everything that was proper." (R.R. 728a.)

The Driver of the vehicle which struck the decedent, however, testified during his deposition that he was unable to see the decedent prior to striking him due to the position of the bus, along with the fact that the operator of the bus had the high beams improperly activated as he drove towards him and passed him, thus obstructing the Driver's view. He testified in this regard, as follows:

> [The bus] was coming at me, and it had its, you know, high beam lights on. And it temporarily blinded me.
>
> It passed me and it temporarily blinded me. So I looked down at my speedometer. And I recovered my vision, cleared my eyes. And not to long after that, I'd probably say three seconds, I had one second to look, focus, and see a figure on the road. I had another second to say, oh, God, and slammed on my brakes and immediately turned left. And I wound up connecting with this person.

(R.R. 1133a-34a.)

Thereafter, the Driver was asked upon what he based his testimony that the bus had its high beams activated, to which the Driver responded:

21

It's very clear. They'll blind the crap out of you when you're looking right at them. You just can't avoid it. You have to just kind of turn your head sideways or something because you will feel the effect of those lights.

(R.R. 1138a.)

Following the accident, a Crash Reconstruction Report was completed by Trooper Daniel Jones. (R.R. 853a.) The Crash Reconstruction Report of Trooper Jones concluded that the glare from the bus headlights temporarily blinded the Driver, which reduced his ability to observe the decedent.

The Authority's bus driver had a statutory duty to dim or lower the beam of the bus's headlights on meeting the automobile driven by Driver. Section 4306(a) of the Vehicle Code, 75 Pa. C.S. § 4306(a), provides: "Whenever the driver of a vehicle approaches an oncoming vehicle within 500 feet, the driver shall use the low beam of light." Our Supreme Court has held that the plain legislative intent of section 4306(a) "was to prevent motorists from facing excessive glare, so as to reduce the obvious safety hazard that exists when a driver suffers momentary blindness upon being subjected even very briefly to the intense brightness of high beam lamps." *Commonwealth v. Beachey*, 728 A.2d 912, 913 (Pa. 1999).

Whether the bus driver operated the bus in violation of section 4306(a) and whether that violation was a proximate cause of the collision is a question of fact reserved for the jury. *See Biehl v. Rafferty*, 37 A.2d 729, 732 (Pa. 1944) (unless the facts are undisputed the question of proximate cause and intervening agency are for the jury). *See also*, 8 Am. Jur. 2d Automobiles § 803 (Accidents involving vehicles proceeding in opposite directions, generally; failure to dim lights).

Contrary to the trial court's conclusion, Appellant put forth evidence that the Authority's bus driver very well may have not dimmed his headlamps as he was approaching the Driver's vehicle, causing the Driver to be temporarily blinded

22

by the glare and the Authority's conduct in that regard created the foreseeable risk of serious injury or death to the decedent. A jury must determine whether any negligence by the Authority in this regard was a substantial factor in causing the decedent's harm. *Rabutino v. Freedom State Realty Co.*, 809 A.2d 933, 941 (Pa. Super. 2002) ("[w]hether a defendant's conduct has been a 'substantial factor' in causing plaintiff's harm is ordinarily a question of fact for the jury").

Thus, the evidence, viewed in the light most favorable to Appellant, demonstrates that the Authority, if it in fact operated the bus in violation of section 4306(a), increased the risk of physical harm to the decedent; as such, Appellant has established a jury question that the Authority's negligence was a substantial factor in causing the decedent's injuries.

We conclude that the trial court erred in granting the Authority's motion for summary judgment in this respect.

### *The Real Estate Exception (Preliminary Objections)*

Appellant argues that we should reverse the grant of the Authority's preliminary objections because the trial court improperly held that the cause of action asserted in the complaint does not fit into the real estate exception to immunity found in 42 Pa. C.S. § 8542(b)(3).

To reiterate, the complaint avers:

(a) The Authority planned, designed, controlled, located, engineered, constructed, maintained, scheduled, designated, inspected, and/or repaired the bus stop in such a manner that rendered it unsafe for its intended use.

(b) The Authority undertook to install, utilize and control a bus stop at the intersection of SR-196 and Woodside Drive.

23

(c) The Authority failed to ensure that the property was safe for the activities for which it is regularly used, namely a bus stop.

(d) The failure of the Authority to provide any type of safety protection on property that it chose, designated, utilized and controlled as a bus stop resulted in harm in this matter.

(e) The failure of the Authority to properly care for its property caused the decedent to be in the roadway as there was no place for passengers to take any sort of cover or otherwise protect themselves.

(f) This failure on the part of the Authority was a substantial factor in the harm to the decedent.

(R.R. 27a-67a.)

Appellant maintains that these allegations, when taken as true, are sufficient to establish a claim under the real estate exception to immunity.

In Pennsylvania, the real estate exception to immunity is set forth at section 8542(b)(3) of the Tort Claims Act and waives immunity for damages caused by the "care, custody or control of real property in the possession of the local agency." 42 Pa. C.S. § 8542(b)(3). In order to fall within the real property exception, "the injured party must show that (a) the injury resulted from a dangerous condition that (b) stemmed from the care, custody or control of real property, not personalty." *Taylor v. Northeast Bradford School District*, 101 A.3d 144, 148 (Pa. Cmwlth. 2014); *Mellon v. City of Pittsburgh Zoo*, 760 A.2d 921, 924 (Pa. Cmwlth. 2000). A claim "may be predicated on either an affirmative act, or the failure to act, resulting in negligence in the care, custody, or control of the real property." *Brewington for Brewington v. City of Philadelphia*, 199 A.3d 348 (Pa. 2018).

The trial court held that the real estate exception is inapplicable because

24

> [the Authority] neither owned, maintained nor controlled the real estate where the bus stopped. Nor did [the Authority] have a duty to build a shelter of some kind at the location of the bus stop. [The Authority] had control of where it chose to stop the bus, or stated another way, to have a bus stop. However, it had no duty as to the actual real estate itself, nor has [Appellant] alleged sufficiently that an artificial condition or defect of the land itself caused the injury.

[Authority opinion, 12/16/20, pp. 9-10]

Appellant relies heavily on *Brewington* in which our Supreme Court held that an unpadded concrete gymnasium wall could be found to be a defective and dangerous condition of the premises because it was not safe for use in a relay race during gym class. In *Brewington*, the concrete gymnasium wall caused the student's injury. The Supreme Court held that the plaintiff properly pled negligence regarding the "care" of the real property, as that term is commonly understood, to include attention to possible dangers to minimize and reduce risk such as applying padding to concrete gym walls. There, the school district actually owned, possessed and controlled the elementary school and the concrete wall, which caused the minor plaintiff's head injury. In this case, the Authority stopped its bus along a state highway. It had the right to do so, but the undisputed evidence established that the Authority did not own or possess or control the real estate upon which the decedent disembarked.

Furthermore, the real estate exception only applies where the artificial condition or defect of the land itself causes the injury, not when it facilitates injury by a third party. *Combs v. Borough of Ellsworth*, 615 A.2d 462, 465 (Pa. Cmwlth. 1992). The decedent's death was proximately caused by a third party's motor vehicle, not the bus stop. *See Farber v. Pennsbury School District*, 571 A.2d 546

25

(Pa. Cmwlth. 1990) (school district's negligent failure to supervise a school-sponsored sporting event, resulting in injuries, did not fall within the real property exception).

Accordingly, we find the trial court did not err by sustaining the Authority's preliminary objections and concluding that the real estate exception to governmental immunity was not applicable to the Authority.

## B. PennDOT

Next, Appellant argues that the trial court erred in granting summary judgment in favor of PennDOT because questions of fact exist sufficient to establish: (1) that the real estate exception to sovereign immunity applies to PennDOT; and (b) that PennDOT owed the decedent a duty to render SR-196 at its intersection with Woodside Drive safe for its regular and intended use as a bus stop.

As a general rule, the Sovereign Immunity Act[8] grants the Commonwealth immunity from negligence claims. 42 Pa. C.S. § 8521(a); *see also* PA. CONST., art. I, § 11. The Act provides specific exceptions to this general rule. 42 Pa. C.S. § 8522(b)(1)-(10). One such exception pertains to "Commonwealth real estate." 42 Pa. C.S. § 8522(b)(4). The "real estate exception" waives the Commonwealth's immunity in cases involving "[a] dangerous condition of Commonwealth agency real estate . . . ." *Id.*[9]

---

[8] 42 Pa. C.S. §§ 8521-8528.

[9] Specifically, the statute provides:

> (4) A dangerous condition of Commonwealth agency real estate and sidewalks, including Commonwealth-owned real property, leaseholds in the possession of a Commonwealth agency and Commonwealth-owned real property leased by a Commonwealth agency to private persons, and highways under the jurisdiction of a

**(Footnote continued on next page…)**

The Pennsylvania Supreme Court recently summarized the contours of the real estate exception in *Wise v. Huntingdon County Housing Development Corporation*, 249 A.3d 506, 517 (Pa. 2021). There, the Court reaffirmed that a dangerous condition "'must derive, originate from or have as its source the Commonwealth realty.'" *Id.* (quoting *Snyder v. Harmon*, 562 A.2d 307, 311 (Pa. 1989). In other words, if the dangerous condition results from "'a defect in the property or in its construction, maintenance, repair or design,'" immunity is waived. *Id.* (quoting *Jones v. Southern Pennsylvania Transportation Authority*, 772 A.2d 435, 444 (Pa. 2001)). The dangerous condition must "be an artificial condition or defect of the land itself, as opposed to the absence of such a condition, and that artificial condition or defect must be the cause, or a concurrent cause, of the injury." *Id.* (citing *Snyder*, 562 A.2d at 312); *see also Cagey v. Department of Transportation*, 179 A.3d 458, 463 (Pa. 2018) (outlining elements).

The plaintiff's allegation in *Wise* fell within the real estate exception. She alleged that she tripped and fell while walking on a sidewalk because available outdoor lighting was obscured, due to the arrangement of the sidewalk, the pole light, and a tree. 249 A.3d at 509, 518. The sidewalk, pole light, and tree were all part of the real property and so the plaintiff "identified a dangerous condition that results from a defect in the property or in its construction, maintenance, repair, or design." *Id.* at 518 (citation omitted).

In contrast, allegations of the absence of a safety feature falls outside the real estate exception. Thus, when the allegation is that state-owned real estate

Commonwealth agency, except conditions described in paragraph (5).

42 Pa. C.S. § 8522(b)(4).

27

lacks lighting or guardrails, sovereign immunity attaches. *See Wise*, 249 A.2d at 515-516, 518 (discussing *Dean v. Department of Transportation*, 751 A.2d 1130, 1134 (Pa. 2000)); *Snyder*, 562 A.2d at 312-13.

As with all exceptions to sovereign immunity, the real estate exception "must be strictly construed." *Page v. City of Philalphia*, 25 A.3d 471, 476 (Pa. Cmwlth. 2011); *see Wise*, 249 A.3d at 514. Such a construction is necessary to give effect to "the legislature's clear intent to insulate government from exposure to tort liability." *Page*, 25 A.3d at 476.

Here, Appellant contends that it was the absence of safety features on the road, "pedestrian accommodations," such as a crosswalk or "adequate lighting" that caused the accident. However, the lack of these safety features does not trigger the real estate exception to sovereign immunity. *See Dean*, 751 A.2d at 1134; *Snyder*, 562 A.2d at 312-313.

Appellant also argues that there were multiple dangerous conditions in SR-196: the "slight curve," and the "shallow shoulder," which is "not far from . . . [i]naccessible vegetation." (R.R. 879a; Appellant's Brief at 59, 61-62, 65-66.) This argument also fails. First, as we concluded above, these road conditions were not the cause of the accident. The slight curve is approximately 100 yards from the accident site. (R.R. at 528a.) The "shallow shoulder" and nearby "[i]naccessible vegetation" are on the side of the road. This accident happened in the middle of the southbound lane. *See Wise*, 249 A.3d at 517 ("artificial condition or defect must be the cause, or a concurrent cause, of the injury"). Again, there was no evidence of record to establish that the decedent was forced to cross the road at the moment he did, rather than waiting at the shoulder.

Next, Appellant argues that PennDOT "allowed" and "facilitated the erection and installation" of the Woodside Drive Bus Stop. (Appellant's Brief at 58-60.) This argument lacks any support in the record. To the contrary, the undisputed evidence established that the Authority was not required even to notify PennDOT that a certain area had been designated a bus stop, let alone seek its approval. (R.R. 480a, 872a.) The Authority can establish a bus stop wherever it desires. (R.R. 480a-81a.)

Appellant's contention that PennDOT is not entitled to immunity because it maintains SR-196 and, therefore, "is in control of the area," is also flawed. (Appellant's Brief at 60-61.) Mere control of the area, as in regularly plowing the road of snow or cutting the nearby grass, is not enough to negate sovereign immunity. There must be evidence that the improper maintenance flowed "from a defect in the real property itself." *Nardella v. Southern Pennsylvania Transportation Authority*, 34 A.3d 300, 304 (Pa. Cmwlth. 2011) (SEPTA's failure to apply melting agents to accumulating ice did not fall within real estate exception as "[t]hese allegations of improper maintenance did not result from a defect in the real property itself").

Accordingly, based on the foregoing, we conclude that the trial court correctly entered summary judgment in favor of PennDOT.[10]

## C. **The Property Owners Association**

Appellant next argues that the trial court erred by granting summary judgment in favor of the Property Owners Association. Appellant contends that the

_____

[10] Since PennDOT is immune from liability in this instance, the issue of whether Appellant is precluded from recovering damages from PennDOT for the decedent's medical bills is moot. *See Zitney v. Appalachian Timber Products, Inc.*, 72 A.3d 281, 290 (Pa. Super. 2013) (where jury did not find defendants liable, damages issue was moot).

29

Association was negligent in creating, encouraging and facilitating the use of Woodside Drive as a bus stop where no safety measures were implemented for the protection of the passengers getting off at that location. Appellant further alleges that the Association unreasonably refused the request of the Authority to establish a fixed route within the gated development, which arguably would have eliminated the need for the decedent to use the Woodside Drive Bus Stop.

We find the trial court properly granted summary judgment in favor of the Property Owners Association.

A property owners association owes duties to the members of its common interest community, including:

(1) To use ordinary care and prudence in managing the property, and financial affairs of the community that are subject to its control;

(2) To treat members fairly;

(3) To act reasonably in the exercise of its discretionary powers including rule making, enforcement, and design control power;

(4) To provide members with reasonable access to information about the association, the common property and the financial affairs of the association.

Restatement (Third) of Property (Servitudes), § 6.13 (American Law Institute 2000); *McMahon v. Pleasant Valley West Association*, 852 A.2d 731 (Pa. Cmwlth. 2008).

Appellant maintains that the duties set forth in (1) and (4) of Section 6.13 required the Association to ensure that the Woodside Drive Bus Stop was safe. As the trial court observed, however, the bus stop was established by the Authority, with no involvement of the Association. The Woodside Drive Bus Stop was, therefore, not in the control of the Association. Accordingly, we agree with the trial

court that the Association did not have a duty with respect to managing the Woodside Drive Bus Stop.

Appellant also argues that by allowing the Authority to construct shelters at three of the five stops on SR-196, a duty was somehow created on behalf of the Association to ensure that all of the stops, including the Woodside Drive Bus Stop, were safe. Appellant relies on Restatement (Second) of Torts § 323 (American Law Institute), pertaining to the negligent performance of a gratuitous undertaking to render services. This reliance is misplaced.

In *Newell v. Montana West, Inc*., 154 A.3d 819 (Pa. Super. 2017), the administrator of the estate of a nightclub patron who was struck by a car and killed while crossing the highway next to the nightclub to reach his car sued owners and operators of the nightclub for negligence, alleging that the defendants provided insufficient parking for their patrons. The trial court granted summary judgment for defendants. Affirming, the Superior Court held that a landowner could not be held liable to a business invitee for injuries that occurred to the invitee on an adjoining highway or other property as a result of a breach by the landowner of an alleged duty to provide sufficient parking on its own premises. The court reasoned, in part, that the lack of sufficient parking did not impose a duty on defendants to protect their patrons from parking elsewhere under Restatement (Second) of Torts § 323, which provided liability for negligently undertaking to provide services for the protection of another. *Id*. at 826-828, 834, 838.

Here, the Association permitted the Authority to construct and operate three bus shelters on the Association's property to protect riders from the weather. The Association was not rendering services to its residents by allowing the Authority to erect bus stops on its property. The trial court properly found that the Association,

31

by allowing some shelters on its land, did not impose a duty to ensure that all of the bus stops were safe, including the Woodside Drive Bus Stop, which was not located on the Association's property but rather on SR-196.

Appellant next argues that the board of directors of the Property Owners Association unreasonably denied the proposal of the Authority to allow its buses inside the private, gated community and that this constituted a breach of the duties it owed to its members, including the decedent. This argument fails as well.

Proximate cause does not exist where the defendant's alleged negligence was so remote that the defendant cannot be held legally responsible as a matter of law for the harm done. *Brown v. Philadelphia College of Osteopathic Medicine*, 760 A.2d 863, 868 (Pa. Super. 2000). Proximate cause is a legal question. Proximate cause must be established before the question of actual cause may be put to the jury. *Reilly v. Tiergarten, Inc.*, 633 A.2d 208, 210 (Pa. Super. 1993).

Here, the trial court properly determined that other factors, most significantly the fact that the decedent tried to cross SR-196 at night with oncoming traffic, and the failure of the Driver who struck the decedent to observe and/or avoid the decedent were both the legal and factual cause of the accident. Conversely, the refusal of the Association to allow Authority buses into the development or its alleged duty to ensure that the Woodside Drive Bus Stop was safe was not the proximate cause of the accident. Accordingly, we conclude that the trial court properly found that the alleged acts and omissions of the Property Owners Association were too far removed from the accident to be the legal or proximate cause of the decedent's harm.

32

# V. **CONCLUSION**

For the foregoing reasons, the trial court did not err in granting summary judgment in favor of PennDOT and the Property Owners Association, and in sustaining the preliminary objections of the Authority. However, the trial court did err in granting summary judgment in favor of the Authority on Appellant's claim of negligence pertaining to the bus driver's use of the bus's high beams. Accordingly, we must reverse the trial court to this limited extent and remand for further proceedings consistent with this Opinion. Jurisdiction is relinquished.

_____
PATRICIA A. McCULLOUGH, Judge

Judge Fizzano Cannon did not participate in this decision.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Sean Essington, Administrator of the Estate of David Essington, deceased, Appellant | : : : | No. 1081 C.D. 2022 |
| v. | : : : | |
| Monroe County Transit Authority, A Pocono Country Place Property Owners Association, Inc. a/k/a A Pocono Country Place Property Owners Association and Commonwealth of Pennsylvania, Department of Transportation | : : : : : : : : | |
| v. | : : | |
| Joaquin Acevedo-Soltren | : | |

## *ORDER*

AND NOW, this 11th day of July, 2023, the August 15, 2022 orders entered by the Court of Common Pleas of Monroe County (trial court), granting summary judgment in favor of the Commonwealth of Pennsylvania, Department of Transportation, and A Pocono Country Place Property Owners Association, Inc., and dismissing the complaint filed by Sean Essington, Administrator of the Estate of David Essington, deceased, as against these two defendants, are hereby AFFIRMED.

The August 15, 2022 order entered by the trial court granting summary judgment in favor of Monroe County Transit Authority (Authority) is hereby REVERSED to the extent it granted summary judgment to the Authority on Sean Essington's claim of negligent operation of high beams. The case is REMANDED to the trial court for further proceedings consistent with this Opinion.

The trial court's December 16, 2020 order sustaining the preliminary objections of the Authority is hereby AFFIRMED.

Jurisdiction is relinquished.

_____
PATRICIA A. McCULLOUGH, Judge